**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRENDA J. WEIL, | Case No. 1:21-cv-00500-JLT-EPG |
| Plaintiff, | ORDER GRANTING DEFENDANT RASIN CITY ELEMENTARY SCHOOL DISTRICT'S |
| v. | MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT FRESNO |
| RAISIN CITY ELEMENTARY SCHOOL DISTRICT; FRESNO COUNTY SUPERINTENDENT OF SCHOOLS; and DOES 1 through 100, inclusive, | COUNTY SUPERINTENDENT OF SCHOOLS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | (Docs. 133, 134) |

Brenda Weil is a retired school administrator previously employed by various school districts within the Fresno County, during which time she paid into a state-operated pension fund, CalPERS. After her retirement in 2010, she worked as an independent contractor for Defendant Raisin City Elementary School District. It was later discovered that this may have violated CalPERS' rules on post-retirement work; and CalPERS clawed back some pension benefits that had already been disbursed to Plaintiff. In response, Plaintiff filed the instant action, claiming that Defendants are legally obligated to indemnify her for the amount clawed back by CalPERS and that Defendants violated a variety of employment-related statutes and regulations.

For the reasons set forth below, the Court **GRANTS IN PART** Defendant RCESD's motions for summary judgment.

//

//

//

1

## I.    INTRODUCTION

### A. Background

#### 1.  Defendants

Raisin City Elementary School District is a public school district located in Fresno County, California. RCESD has a Board of Trustees with five elected members which governs the District. (Doc. 134-3 at 9; *see also* Doc. 145-1 at 2.)

Fresno County Superintendent of Schools ("FCSS") "is a duly elected decision-making body for Fresno County that is legally required to ensure that school districts under its supervision and/or purview (including, but not limited to, RCESD) remain fiscally solvent and in compliance with state and federal laws." (Doc. 155 at 13.) "FCSS has a number of district-specific departments, including, *inter alia*, a District Financial Services Department, a District Payroll Department, an Accounts Receivable Department, and an Information Systems & Technology Department." (*Id*.) "By way of its District Payroll Department, FCSS: (i) audits RCESD's monthly district payrolls and automatic pay deposits; (ii) prepares [Internal Revenue Service Form] 1099s and W-2 statements for RCESD employees; (iii) deposits federal and state withholdings for RCESD employees; (iv) deposits payroll benefits (FICA/Medicare, etc.) for RCESD employees; and (v) monitors and reports deposits to CalPERS. By way of its Accounts Receivable Department, FCSS audits invoices RCESD receives from vendors and prepares corresponding 1099 statements. By way of its Information Systems & Technology Department, FCSS provides technology support services and use of its Everest Software System ('Everest') to RCESD." (*Id*. at 14 (internal citations and footnotes omitted).)

#### 2.  Plaintiff

From August 1985 to her retirement in April 2010, Weil was almost continuously employed by various public-school districts within Fresno County. (Doc. 11 at ¶¶ 24, 27.) During this employment, Weil paid into a pension fund managed by the Board of Administration of the California Public Employees' Retirement System ("CalPERS"); she started receiving her pension benefits upon her retirement. (*Id*. at ¶¶ 25, 27.)

"In July 2010, RCESD's then-Superintendent, Superintendent Sandoval, 'hired' then-

recently retired Plaintiff as a 'Consultant' for purposes of: (i) 'replac[ing]' then-FCSS employee Betty Thompson (who had recently stopped performing financial services for RCESD on behalf of FCSS); and (ii) helping RCESD (who was then-experiencing a budget deficit of over $800,000.00) 'recover and become a solvent school district.'" (Doc. 155 at 14 (citations and footnote omitted).) RCESD Superintendent Ramirez allegedly "represented to Plaintiff that: (i) the additional work Plaintiff was being asked to perform would neither render Plaintiff an employee nor violate the PERL[1]; (ii) Plaintiff would not be in violation of the PERL if her hours exceeded the 960 hour cap as the additional work Plaintiff was being asked to perform was that of an independent contractor—not an employee; and (iii) the October 8, 2014 agreement did not need an end date." (*Id*. at 16.) Plaintiff alleges that Defendants RCESD and FCSS acted as her joint employer. (Doc. 156 at 13–15.)

"From 2014 to November 2019, Plaintiff performed a multitude of services on behalf of Defendants for which she was paid via payroll (as an employee) and accounts payable (as an independent contractor). Among other things, Plaintiff: (1) trained RCESD school employees; (2) drafted/prepared budget reports, payroll, requisitions, and purchase orders; and (3) gathered, wrote, and submitted financial reports for distribution and approval to both RCESD's Governing Board and FCSS." (Doc. 155 at 15 n.9 (internal citations omitted).) It is undisputed that "Plaintiff was paid in full for each invoice/time sheet she submitted to RCESD from January 2015 to December 2019." (Doc. 145-1 at 6 (undisputed material fact No. 16).)

### 3. CalPERS' Investigations

FCSS conducted a financial audit of RCESD and circulated its report around July and August of 2017, detailing numerous instances of mismanagement by RCESD. (Doc. 155 at 18–19.) The report also found that Plaintiff may have been misclassified as an independent contractor, which is the principal subject of the instant action. (*Id*. at 19.)

Relatedly, in July 2017, CalPERS commenced an investigation into Weil's employment status after receiving an ethics complaint that Weil was being paid as an employee of the School District while still drawing pension benefits. (Doc. 11 at ¶ 42.) Defendants received notice of this

---

[1] California Public Employees' Retirement Law ("PERL").

investigation in late July 2017. (*Id*. at ¶¶ 42–43.) RCESD informed Weil that the investigation would reveal that she was an independent contractor and that the School District "would take care of it" on her behalf. (*Id*. at ¶ 44.) RCESD allegedly informed Plaintiff that it would jointly defend her and itself in challenging the investigation and any findings regarding her employment status. (*Id*.) Based on this alleged representation, Plaintiff believed that RCESD would defend and indemnify her. (*Id*. at ¶ 44.)

In September 2018, CalPERS issued a preliminary adverse determination to Weil and Defendants, which found that between April 12, 2010 and June 30, 2017, Weil worked for Defendants as a common-law employee and thus violated numerous California Government Code provisions prohibiting the public employment of a person receiving pension benefits through CalPERS. (Doc. 11 at ¶¶ 46, 55–56.)

In June 2019, CalPERS issued a final determination, finding that Weil was working for Defendants as a common-law employee from April 1, 2015, to March 31, 2017, in violation of CalPERS' post-retirement employment rules. (Doc. 11 at ¶ 58.) "Employing the common law employment test, CalPERS specifically found that, beginning April 1, 2015, Plaintiff: (1) provided training to RCESD school employees; (2) was issued W-2s and an e-mail address from RCESD; (3) was covered by RCESD for travel expenses incurred; and (4) served in an at-will capacity under RCESD." (Doc. 155 at 21 (citation omitted).) Based on this finding, CalPERS determined that Weil was subject to mandatory reinstatement as of April 1, 2015, which in turn required her to repay $365,737.60 in overpaid pension benefits. (Doc. 11 at ¶ 58.)

Initially, the School District appealed CalPERS' determination for itself and for Weil. (Doc. 11 at ¶¶ 57, 59.) Then, on November 26, 2019, the School District informed Weil that it would no longer defend and indemnify her with respect to the final determination. (*Id*. at ¶ 61.) Weil then retained independent counsel to continue her appeal. (*Id*. at ¶ 62.) She was thereafter forced to abandon her appeal and reimburse CalPERS. (*Id*. at ¶ 65.) Since September 24, 2019, CalPERS has terminated or withheld Weil's pension benefits. (*Id*. at ¶ 60.)

Moreover, between January and November 2019, Defendants allegedly withheld payments for Plaintiff's services, allegedly because of uncertainties and confusions over the then-

4

pending CalPERS proceedings. (*See* Doc. 155 at 22–23 & n.19.)

**B. Procedural History**

Weil filed her complaint in state court on February 2, 2021, which was subsequently removed to this Court on March 24, 2021. (Doc. 1.) This Court later granted in part and denied in part Defendants' motion to dismiss under Rule 12(b)(6). (Doc. 10.) Afterward, Plaintiff filed the First Amended Complaint in which she sets forth the following causes of action: (1) breach of contract, (Doc. 11 at ¶¶ 67–73); (2) implied contractual indemnity, (*id*. at ¶¶ 74–78); (3) equitable indemnity, (*id*. at ¶¶ 79–83); (4) negligence, (*id*. at ¶¶ 84–91); (5) failure to pay minimum wages, (*id*. at ¶¶ 92–105); (6) failure to pay overtime wages under California law, (*id*. at ¶¶ 106–14); (7) failure to pay overtime wages under federal law, (*id*. at ¶¶ 115–21); (8) failure to provide meal periods, (*id*. at ¶¶ 122–32); (9) failure to provide rest periods, (*id*. at ¶¶ 133–42); (10) failure to reimburse for employment-related expenses, (*id*. at ¶¶ 143–52); and (11) declaratory relief, (*id*. at ¶¶ 153–55). The Court dismissed with prejudice (a) the ninth and tenth causes of action entirely, and (b) the first, fifth, sixth, and eighth causes of action to the extent they seek recovery through a collective bargaining agreement. (Doc. 20 at 8.)

Defendants subsequently filed a motion for judgment on the pleadings ("MJOP"). (Doc. 83.) However, before the Court could address that motion, the parties conducted discovery, after which Defendants FCSS and RCESD separately moved for summary judgment. (Docs. 133, 134.) The parties then submitted a joint supplemental brief in response to several specific questions from the Court regarding the MSJs. (Doc. 163.)

## II.    PRELIMINARY MATTERS

**A. Judgment on the Pleadings**

Under Rule 12(c), a motion for judgment on the pleadings must be made after pleadings are closed but "early enough not to delay trial." Fed R. Civ. P. 12(c). A district court has "the discretion to accept and consider extrinsic materials offered in connection with [Rule 12] motions, and to convert the motion to one for summary judgment when a party has notice that the district court may look beyond the pleadings." *See Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007) (citing *Portland Retail Druggists Ass'n v. Kaiser Found.*

*Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981)).

The Court finds it unnecessary to formally convert the motion for judgment on the pleadings into a motion for summary judgment because the parties have fully briefed the two pending motions for summary judgment ("MSJs"), (Docs. 133, 134), and the Court's decision as to the pending MSJs may substantially moot the need to consider the MJOP, which contains many overlapping arguments.

**B. Legal Standard for the Pending Motions for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the evidence and all reasonable inferences therefrom, while interpreting them in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See id*. at 323. Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must present affirmative evidence from which a reasonable jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

At the summary judgment stage, the Court draws all reasonable factual inferences in favor of the non-movant. *Id*. at 255. The Court "does not assess credibility or weigh the evidence," but simply determines whether there is a genuine dispute of material fact for trial. *House v. Bell*, 547 U.S. 518, 559–60 (2006); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the Court]."). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("The

6

mere existence of a 'scintilla' of evidence is not enough to create a 'genuine issue of material fact' in order to preclude summary judgment." (quoting *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995))).

"To survive summary judgment, [ P]laintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted); *see also Genuine Enabling Tech. LLC v. Sony Grp. Corp.*, 167 F.4th 1196, 1202 (Fed. Cir. 2026) ("[T]he nonmoving party cannot defeat summary judgment 'with conclusory allegations, unsupported assertions, or only a scintilla of evidence.'" (quoting *Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1127–28 (Fed. Cir. 2021))). "Conclusory, speculative testimony . . . is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citations omitted).

### C. Plaintiff's "Separate Statement of Additional Undisputed Material Facts"

Before turning to the merits of the case, the Court addresses Defendants' objections to Plaintiff's so-called "Separate Statement of Additional Undisputed Material Facts." (*See* Doc. 145-1 at 13–65.) The Court agrees with Defendants' argument that Local Rule 260 only permits a non-moving party like Plaintiff to file a ***concise*** statement of disputed facts, and not a rambling statement of allegedly ***un***disputed facts. (Doc. 158-3 at 1–3.) On this basis, the AUMF is **STRICKEN**.

Moreover, even if the Court was obligated to deal with these filibuster-like tactics, the AUMF doesn't do what Plaintiff claims. For example, in her opposition to the motion, Plaintiff attempts to link RCESD's actions to FCSS, by arguing:

> (i) FCSS is considered RCESD's employer for CalPERS purposes (and therefore vicariously liable for the acts of RCESD through its agents); and (ii) RCESD and FCSS are considered the joint employers of Plaintiff. AUMF Nos. 2, 5-13, 19-41, 44-47, 49-64, 72-72, 93-96, 104-107, 122-123, 126-129, 161-164, 171-173, 175-189, 199-201, 219-222, 246, 250, 254-255, 257-259, 261-264. At a minimum, there are disputed facts on this issue that require a trial.

(Doc. 155 at 32–33.) Many, if not most, of the cited AUMFs do not support this assertion. For example, AUMF 5-13 (Doc. 144-1 at 12–15) explain, in part, that the FCSS promotes financial

stability of the various districts, detail some of the tasks Plaintiff performed while employed at RCESD and show that some of her work was reviewed by the Financial Services Division of the FCSS. These facts don't prove—or imply—that FCSS is the employer of RCESD.

Moreover, for example, AUMF No. 9, which is one fact upon which the above assertion relies, lists the following as "[s]upporting [e]vidence":

> Weil Dec. ¶ 19-20, Ex. V; Sandoval Depo, VOL. 1, 37:14-38:6; 38:19-39:10; 81:23-82:9; 83:13-22; 106:19-107:3; 107:8-13; 115:11-116:2; 120:17-20; 122:4-11; 135:25-136:15; 170:20-171:16; 172:3-17; 175:5-14; 210:24-211:6; Sandoval Depo, VOL. 2, 250: 13-17; 258:6-25; 262:11-263:13; 293:3-294:6; 296:19-297:6; 297:12-298:9; 301:14-18; 302:5-22; 302:25-303:22; 310:11-21; 321:4-17; 322:6-7; 324:18-325:13; 346:4-12; 348:22-349:6; 349:10-21; 353: 18-354:4; 354:20-355:7; 355:19-356:25; 357:23- 360:3; 360:11-362:14; 363:5-364:2; 365:2-19; 381:15-23; 385:4-386:25; 388:10-389:23; 390:13-24; 391:6-394:22; 397:13-25; Sandoval Depo Exhibit 27; Steen Depo, 15:2-6; 48:6-13; 74:14-17; 185:21-187:8;189:24-190:10; 208:12-25; 209:8-23; Steen Depo Exhibit 11; Vargas Depo, 48:1-20; 52:18-53:2; 66:2-3; 77:19-22; PERS 0874-PERS 0877.

(Doc. 144-1 at 31–32.) However, spot-checking these citations reveals that the evidence cited does not support the fact. For example, neither paragraph 19 nor 20 of Plaintiff's declaration nor Exhibit V attached to her declaration support the fact. Likewise, no citation to the Sandoval deposition set forth in Volume I,[2] supports the fact.

As noted above, Local Rule 260 does not authorize Plaintiff to submit "[a]dditional [u]ndisputed [m]aterial [f]acts," let alone 264 of them. Even more important, the proponent of a fact must support the fact by actual evidence, which does not appear to have happened here. For these reasons, the Court declines to presume that Plaintiff's AUMFs are "undisputed" or "material" for purposes of resolving the pending motions for summary judgment.

### III.   DISCUSSIONS

#### A. Second and Third Causes of Action

Under the second cause of action, Plaintiff alleges that, "[a]s implied in the nature" of her

---

[2] As an aside, the Court observes that citation should be to the docket number and the page number of the specific docket entry, not to the deposition itself. The Court wasted an extended amount of time trying to find the deposition transcript on the docket, and it can come to no good reason why Plaintiff would want to make it so difficult for Court to find the evidence, which she contends demonstrates a triable issue of material fact.

consulting agreements with RCESD, Defendants "impliedly agreed to indemnify" her for "any loss, claims, expenses, and liability that [she] might sustain at any time as a consequence of damage, injury, or liability associated with [her] employment services." (Doc. 11 at ¶ 75.) Plaintiff further alleges under the third cause of action that, "[a]s implied in the nature of the employment relationship[,]" Defendants "impliedly agreed to indemnify" her for "any loss, claims, expenses, and liability that [she] might sustain at any time as a consequence of damage, injury, or liability associated with [her] employment services." (*Id*. at ¶ 80.) As a result of Defendants' alleged misclassification of her as an independent contractor. (*Id*. at ¶¶ 78, 83.) Defendants argue that "[i]mplied contractual indemnity and equitable indemnity are both equitable claims," and that they "cannot be liable for repayment of illegally received CalPERS benefits." (*See* Doc. 134-3 at 15.)

Under California state law,

> [t]he obligation of indemnity, which we have defined as "the obligation resting on one party to make good a loss or damage another has incurred" may arise under the law of this state from either of two general sources. First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in *equitable considerations* brought into play *either by contractual language not specifically dealing with indemnification or by the equities of the particular case*.

*E. L. White, Inc. v. City of Huntington Beach*, 21 Cal. 3d 497, 506–08 (Cal. 1978) (internal citations and footnotes omitted) (emphases added). Thus, both the second (implied contractual indemnity) and third (equitable indemnity) causes of action are grounded in traditional principles of equity.

Plaintiff was forced by CalPERS to repay $365,737.60 of retirement benefits that she should not have received. Equity—i.e., fairness—does not necessarily require Plaintiff to receive her ill-gotten gains, regardless of whether she sincerely believed she was entitled to them. Stated differently, notwithstanding any purported misrepresentation on the part of FCSS or RCESD, it would not be "unfair" to require Plaintiff to pay back $365,737.60 that she should not have received. In addition, it is undisputed that Plaintiff knew about the 960 hours work restriction by CalPERS and attempted to skirt around it; she did so by billing part of her work as an employee

and part of her work as an independent contractor, even though she performed similar duties:

> Q. Okay. So following retirement. . ., you have an understanding that you are able to work for a CalPERS employer up to 960 hours; is that correct?
> A. Yes.
> Q. Are there any other restrictions that you are aware of?
> A. No. I'm not aware of that. Unless you go through, like I had my business.
> Q. And what can you do through your business?
> A. Just perform other *similar* duties. I mean, that's what I was asked to do.
> Q. Okay. So you were asked to perform other similar duties that you were performing when you were an employee[?]
> A. Yes.

(*See* Doc. 134-4 at 13 (emphasis added).) The principles of equity do not weigh in favor of one who attempted to skirt around a well-established rule by relying on a perceived loophole; Plaintiff may not complain about unfairness because her gambit backfired. Nor could this Court impose what it believes is right and equitable (i.e., fair) after the legislature has found that the "right" outcome is for a pensioner to return her ill-gotten pension benefits to the public purse. (*See* Doc. 134-3 at 15 (noting that Section 21220 of the California Government Code allocates liability for reimbursement solely to the retiree, not the employer).)

Moreover, under California state law, traditional equitable indemnification and implied contractual indemnification "are only available when there is a joint legal obligation between the indemnitee [Plaintiff] and indemnitor [Defendants] to the injured party [CalPERS]." *Fed. Deposit Ins. Corp. v. RPM Mortg., Inc.*, No. 15-cv-05534-EMC, 2018 WL 1335812, at *3–4 (N.D. Cal. Mar. 15, 2018) (citing *Prince v. Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1160–61 (Cal. 2009)). Without a joint legal obligation to CalPERS, there can be no equitable indemnification or implied contractual indemnification to "shift" liability between Plaintiff and Defendants. *Prince*, 45 Cal. 4th at 1158, 1161 ("[T]raditional equitable indemnity requires no contractual relationship between an indemnitor and an indemnitee. Such indemnity is premised on a joint legal obligation to another for damages, but it does not invariably follow fault." "The principal question for us is whether or not a requirement of a joint legal obligation also applies when implied contractual indemnity is at issue. We conclude the answer is yes[.]" (citation, footnote, and quotation marks

omitted)).

RCESD contends that Section 21220 of the California Government Code allocates liability for reimbursement solely to the retiree, not the employer. (Doc. 134-3 at 15.) Plaintiff, on the other hand, has failed to explain how Plaintiff and Defendants are *joint tortfeasors to CalPERS.* As such, the Court **GRANTS** Defendants' motion for summary judgment with respect to the second and third causes of action.

**B. First Cause of Action: Breach of Contract**

Plaintiff alleges under the first cause of action that by misclassifying her as an independent contractor, she was deprived of many employment benefits—e.g., overtime wages and health insurance—that were earned but not given to her. (Doc. 11 at ¶¶ 69–71.) If Plaintiff was actually paid for all hours worked in accordance with the terms of the contracts, Defendants would not be liable for unpaid wages under a breach of contract theory.[3]

On the one hand, there is no dispute that Defendants have paid all amounts actually

---

[3] The parties agree that the Consulting Agreements do not contain a written indemnification clause. (Doc. 145-1 at 8.) To the extent Plaintiff claims there is an explicit oral indemnification clause, it could not have been tethered to the Consulting Agreements, all of which expressly disavow non-written representation or agreement. To the extent the promise or agreement to indemnify Plaintiff amounted to a standalone contract that is separate from the Consulting Agreements, it may be an unenforceable, *unilateral* illusory promise. *See, e.g.*, *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1439 (Cal. Ct. App. 2012) ("One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance. This unlimited choice in effect destroys the promise and makes it illusory." (citations and quotation marks omitted)). To the extent that there is an implied contractual indemnification clause, it is addressed above.

Finally, Plaintiff's repeated reference to the Contract Clause of the California Constitution is without merit. (Doc. 156 at 23; Doc. 163 at 2.) *Miller v. State of California*, a case cited by Plaintiff, merely stands for the proposition that pension benefits are earned but deferred income, which may be protected by the California Constitution once vested. 18 Cal. 3d 808, 816 (Cal. 1977). In *White v. Davis*, 30 Cal. 4th 528 (Cal. 2003), another case cited by Plaintiff, the California Supreme Court addressed the question of whether state employees are entitled to compensation for work performed when the legislature fails to pass a budget. Because California "Government Code section 1231 expressly provides for the continuation of the employment relationship between the state and its employees during a budget impasse, without any change 'in salary or other conditions of employment[,]'" and because "a public employee's 'right to the payment of salary earned' is 'protected by the contract clause of the [California] Constitution,' [the California Supreme Court] conclude[d] that employees who work during a budget impasse obtain a right, *protected by the contract clause,* to the ultimate payment of salary that has been earned." *Id*. at 571 (internal citation omitted) (emphasis in original). Both of these cases stand for the proposition that a *pre-existing* employment relationship or obligation may be protected by the California Constitution—and neither stands for the proposition that an employment contract may be implied out of thin air.

11

submitted through Plaintiff's timesheets and invoices. (Doc. 145-1 at 6 (undisputed material fact No. 16).) Plaintiff has proffered no serious basis for her contention that Defendants should have known that the invoices and timesheets are inaccurate.

On the other hand, Plaintiff contends that she "was not compensated for any of the financial work she performed" "during the period of mid-January 2019 through November 2019," (Doc. 155 at 23 (citing AUMF at 106, 171, 173, 175–90)), because "she was instructed" not to bill for her services in light of the then-pending CalPERS appeal, (*see* Doc. 145-1 at 5). This assertion is perplexing because her expert, Mr. Edward Garcia, reports that she received $44,072.29 from RCESD in 2019, according to an IRS Form 1099. (Doc. 134-4 at 521.)

The Court is disappointed by the parties' apparent unwillingness to seriously investigate this issue in response to the Court's order for supplemental briefing. (Doc. 163 at 2–5). For example, the parties could have proffered bank statements or transaction records, which could conclusively resolve the dispute over whether Plaintiff was indeed paid.

Notwithstanding the paucity of concrete evidence from both sides, the Court ultimately finds that Plaintiff has a slightly better argument for allowing the case to proceed to trial. First, a reasonable jury could credit Sandoval's testimony that Plaintiff was told to "hold off" on submitting timesheets for 2019, (*see* Doc. 163 at 3–4), and was not subsequently paid. Second, Plaintiff's argument that the 2019 Form 1099 was meant to describe her pay in 2018 is facially plausible. For one, there is no other source accounting for her invoice-related pay in 2018. For another, while there is some discrepancy between $39,000 and $44,000, that difference is not so significant as to render Plaintiff's explanation implausible. The parties may present further evidence on this issue during trial.

As such, RCESD's motion for summary judgment with respect to the first cause of action is **GRANTED** except as to the 2019 pay. The Court is willing to entertain a supplemental motion for summary judgment should the parties uncover concrete documentary evidence such as bank or accounting records regarding whether Plaintiff was indeed paid for her work in 2019.

### C. Fourth Cause of Action: Tort Claim in the Context of a Contractual Dispute

The fourth cause of action alleges that Defendants owed Plaintiff a "duty to use

reasonable care, diligence, and judgment in classifying and employing Plaintiff[,] includ[ing] a duty to indemnify and hold Plaintiff harmless from any loss, claims, expenses, and liability that Plaintiff might sustain at any time as a consequence of damage, injury, or liability associated with Plaintiff's employment services." (Doc. 11 at ¶ 88.) Defendants argue that Defendants have no tort law duty to defend or indemnify Plaintiff. (Doc. 134-3 at 28.) Plaintiff advances several arguments in response, none of which the Court finds persuasive.

First, Plaintiff argues that "Defendants' negligent failure to defend and indemnify Plaintiff arises out of contract" law. (Doc. 156 at 31.) In California, "[t]ort damages have been permitted in contract cases where a breach of duty directly causes physical injury; for breach of the covenant of good faith and fair dealing in insurance contracts; for wrongful discharge in violation of fundamental public policy; or where the contract was fraudulently induced. In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Erlich v. Menezes*, 21 Cal. 4th 543, 551–52 (Cal. 1999) (internal citations omitted). The instant action, however, is neither an insurance case nor does it involve physical injury or wrongful discharge. This leaves the negligence claim resting on a theory of fraudulent inducement, which is "guid[ed]" by the "principle [] that '. . . a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent **terms** critical to that contract.'" *Crystal Springs Upland Sch. v. Fieldturf USA, Inc.*, 219 F. Supp. 3d 962, 968 (N.D. Cal. 2016) (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 992–93 (Cal. 2004)) (emphasis added). Plaintiff, however, has not identified what is the precise "term[] critical to th[e] contract[]" that Defendants had misrepresented. Nor could the Court independently identify such term from the face of the contract.

Second, Plaintiff makes a one-sentence passing reference to Section 815.2. (Doc. 156 at 31.) That statutory provision, however, does not create a substantive right of action, nor does it create a statutory duty between two parties; rather, it merely permits the recovery of damages. *Hearns v. Gonzales*, No. 1:17-cv-00038-AWI-GSA-PC, 2018 WL 1790800, at *2 (E.D. Cal. Apr. 16, 2018). As such, it cannot supply an independent basis for imposing a tort duty upon

13

Defendants.

Third, Plaintiff further points to § 815.6, (Doc. 156 at 31), which provides that a public entity may be liable for an injury if there is "an enactment" that imposes upon the public entity a mandatory duty to protect against the risk of said injury, and said injury is proximately caused by the public entity's failure to discharge the duty with reasonable diligence. Cal. Gov't Code § 815.6. The word "enactment" is crucial—Plaintiff must be point to a statute that specifies a duty. Plaintiff pointed to Section 2800 of the California Labor Code, (Doc. 156 at 31 n.28), which does not expressly apply to public employers; and unless "Labor Code provisions are specifically made applicable to public employers, they only apply to employers in the private sector." *Cal. Corr. Peace Officers' Ass'n v. California*, 188 Cal. App. 4th 646, 652 (Cal. Ct. App. 2010) (quoting *Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal. App. 4th 729, 733 (Cal. Ct. App. 2009)). The text of § 2800 is silent on this front, in marked contrast to nearby provisions which expressly impose obligations on both private and public employers. *See, e.g.*, Cal. Labor Code § 2800.2(b).

In any event, the existence of a statutory duty for purposes of tort law does not overcome § 818.8 immunity, which states that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." *See Cnty. of San Bernardino v. Superior Ct.*, 77 Cal. App. 5th 1100, 1104 (Cal. Ct. App. 2022) ("We agree that under Government Code sections 815 and 815.6, the County is not subject to liability because there was no breach of any statutory or constitutional duty. In addition, even if the County owed [the real parties in interest] such a duty, the County was immune from liability under Government Code sections 818.8 and 822.2."). Here, however, the gist of Plaintiff's argument under the fourth cause of action (negligence) is that Defendants "intentionally made a number of material ***misrepresentations*** to Plaintiff that exposed Plaintiff to independent personal liability." (Doc. 155 at 47 (citation omitted) (emphasis added).)[4] As such,

---

[4] The Court further notes that the Consulting Agreements expressly disavow non-written representation or agreement. (*E.g.*, Doc. 134-4 at 468 ("This Agreement supersedes all prior oral or written agreements, if any, between the parties and constitutes the entire agreement between the parties. The Agreement cannot be changed or modified orally. This Agreement may be supplemented, amended, or revised only in writing by agreement of the parties.").)

the fourth cause of action is barred by § 818.8 immunity. For these reasons,[5] the Court **GRANTS** Defendants' motion for summary judgment with respect to the fourth cause of action.

### D. Sixth (State Law) and Seventh (Federal Law) Causes of Action: Overtime Pay

#### 1. FLRA: Greater Than Forty Hours Per Week

The seventh cause of action alleges that Plaintiff performed services for Defendants as a common law employee but without paying her overtime, as required by the federal Fair Labor Standards Act. (Doc. 11 at ¶¶ 115–21.) "The FLSA requires covered workers to be paid at least 1.5 times their normal rate for all work in excess of forty hours weekly, provided the employer has actual or constructive knowledge that the work is occurring. Employers who violate this requirement are liable for damages in the amount of the unpaid overtime, an additional equal amount as liquidated damages, and reasonable attorney's fee . . . and costs." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1102 (9th Cir. 2018) (internal citations and quotation marks omitted) (alteration in original).

To begin with, the Court notes that Plaintiff entirely failed to respond to Defendants' argument regarding the statute of limitation. (*See* Doc. 163 at 5–6 (citing 29 U.S.C. § 255(a)).) As such, the Court only considers the possibility of overtime work done within two years of the filing of the instant action.

Next, the Court considers Plaintiff's self-reported hours from January to September of 2019, during which Plaintiff attended at least four board meetings—one in March, two in June, and one in September.

---

[5] As Defendants correctly point out, "[t]ort remedies are not generally available for breach of an employment contract." (Doc. 83-1 at 21 (citations omitted).)

| 2018-2019 FISCAL YEAR | HOURS |
|---|---|
| JAN 2019 | 32.00 |
| FEB 2019 | 24.00 |
| MAR 2019 | 56.00 |
| APR 2019 | 48.00 |
| MAY 2019 | 40.00 |
| JUNE 2019 | 69.75 |
| TOTAL | 269.75 |

| 2019-2020 FISCAL YEAR | HOURS |
|---|---|
| JULY 2019 | 144.00 |
| AUG 2019 | 176.00 |
| SEPT 2019 | 120.00 |
| TOTAL | 440.00 |

| TOTAL HOURS DUE FOR BOTH FISCAL YEARS | 709.75 |
|---|---|

(Doc. 134-4 at 445.)

Based on this data, the Court notes that Plaintiff worked equivalent to 18, 8-hour days in July 2019 (that month contained 22 business days). Similarly, Plaintiff worked equivalent to 22, 8-hour days in August 2019 (22 business days in that month). Therefore, her total hours for each month do not suggest that Plaintiff worked for more than 40 hours per week.

The Court has also considered Plaintiff's argument that her attendance at the board meetings necessarily required her to work over 40 hours that week. The Court is not persuaded. For example, because Plaintiff only worked for 70 hours in June 2019, attending two board meetings cannot give rise to a plausible inference that she worked for more than 40 hours in one of the weeks that month. Likewise, attending one board meeting in the month of September does not give rise to a reasonable inference that she worked for more than 40 hours in a week.

A related question is whether Defendants had actual knowledge or constructive knowledge about her overtime work, an indispensable element of Plaintiff's state law wages and hours claims. See Martinez v. Combs, 49 Cal. 4th 35, 70 (Cal. 2010) ("Instead, as we have explained, the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." (emphasis in original)), *as modified* (June 9, 2010); *White v. Starbucks Corp.*,

16

497 F. Supp. 2d 1080, 1083 (N.D. Cal. 2007) ("To prevail on his off-the-clock claim, White must prove that Starbucks had actual or constructive knowledge of his alleged off-the-clock work." (citing *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585 (Cal. 2000), *as modified* (May 10, 2000))).

First, citing AUMF Nos. 187, 192–93, Plaintiff contends that Superintendent Sandoval knew Plaintiff was working late into the evenings," until at least 6:00 PM, even though she arrived in office by 8:00 AM. (Doc. 156 at 35 (citing AUMF Nos. 187, 192–93).) But the cited AUMFs do not support the inference that Plaintiff arrived at the office at 8:00 AM, nor that Sandoval knew about her arrival time. (*See, e.g.*, Doc. 145-1 at 54 ("Of the estimated 50 board meetings he attended during the period of October 26, 2016 to November 2019, Superintendent Sandoval estimates that Plaintiff attended 'at least' 40 of said meetings."), 55 ("During the period of April 1, 2015 to November 2019, there were nights that Plaintiff worked until at least 6:00 to 7:00 p.m.").)[6]

Second, Plaintiff cites to AUMF No. 196—which in turn cites to Sandoval and Steen depositions—and argues that "Defendants knew Plaintiff was working and performing overtime during the 2014 to 2019 period." (Doc. 156 at 35.) However, the referenced portions of Sandoval Deposition merely confirm that Plaintiff prepared for—and attended—board meetings, without any discussion suggesting that Sandoval or Defendants knew about actual *overtime* work. (Doc. 140 at 876–83.) That Plaintiff stayed late to attend a board meeting and therefore worked for more than 8 hours for a particular *night* does not suggest that she worked more than 40 hours for that *week*, or that her supervisor should have *known* about it. (Doc. 158 at 12–13.) For example, one timesheet shows that Plaintiff attended a board meeting until 8:30 PM but still worked less

---

[6] Moreover, these statements are not inconsistent with her timesheets and invoices. For example, on September 10, 2018, Plaintiff attended a board meeting and, therefore, worked from 9:00 A.M. until 7:00 P.M. (Doc. 134-4 at 474.) Similarly, Plaintiff worked six consecutive days between December 11 and 16, 2016, from 8:00 AM to 4:30 PM on Sunday (but only billed 8 hours) and from 8:00 AM to 8:30 PM on Wednesday, staying late to attend a board meeting. (Doc. 134-4 at 374.) This is entirely consistent with Plaintiff's contention that she sometimes worked weekends and stayed late to attend board meetings.

Consequently, Plaintiff's timesheets and invoices do not give rise to an inference that Defendants *knew* that Plaintiff had *underreported* her time. As such, the actual time recorded are outcome-determinative here.

17

than 40 hours for that week. (Doc. 134-4 at 370.) The cited portion of Steen Deposition, (Doc. 140 at 1198), only contains a one-sentence conclusion stating that Plaintiff had done some overtime work—it speaks to nothing about knowledge. No reasonable jury could conclude otherwise.

For these reasons, the Court **GRANTS** Defendants' motion for summary judgment with respect to the FLRA claim under the seventh cause of action.

### 2. State Law: Greater Than Eight Hours Per Day

The FAC also alleges under the sixth cause of action that Defendants failed to provide overtime pay when she performed work in excess of eight hours per day, in violation of § 45128 of the California Education Code. (Doc. 11 at ¶¶ 106–14.) Defendants respond by engaging in complicated statutory interpretation and arguing that § 45128 does not create a private cause of action. (Doc. 134-3 at 22–24; Doc. 133-1 at 26-27.)

Section 45128 is directed to the regulation of classified positions and employees. For one, the plain text of the statute mentions "classified positions" no fewer than three times. For another, § 45128 is located within Title 2, Division 3, Part 25, Chapter 5 of the education code, which regulates classified employees. Further, § 45100 expressly states that § 45128 shall apply to all classified employees. As the Court indicated in the Supplemental Briefing Order, (Doc. 162 at 3), Plaintiff must have worked as a classified employee in order to invoke Education Code Section 45128, *see, e.g.*, Cal. Educ. Code §§ 45100.5, 45101(a), 45103(b)(1–2), 45103(d)(3), 45139(b, h); *Wagner v. Muroc Joint Unified Sch. Dist.*, No. F040773, 2003 WL 22391053, at *8–9 (Cal. Ct. App. Oct. 21, 2003) (unpublished).

Defendants correctly point out, (Doc. 163 at 8), that § 45101(a) requires a classified position "have a designated title, a regular *minimum number of assigned hours* per day, days per week, and months per year, a *specific* statement of the duties required to be performed by the employees in each such position, and the regular *monthly salary ranges* for each such position." Cal. Educ. Code § 45101(a) (emphases added). Plaintiff offers no discussion as to her minimum hours, nor has she provided a *specific* statement of her duties—vague references regarding "financial governmental compliance processes," (*see, e.g.*, Doc. 134-4 at 464), and her working

18

"under the direction and control" of Defendants, (Doc. 163 at 8), do not suffice.

The Court has considered Plaintiff's counterarguments and finds none of them to be persuasive. First, the fact that CalPERS and others believed that Plaintiff worked as a *common law* employee, (*id.*), does not necessarily mean that she was a *classified* employee within the meaning of the *statute*. Second, the actual number of hours worked, (*id.*), does not address the question of her minimum hours or her job description. Third, regardless of the dispute over the character and nature of her work, Plaintiff must raise a genuine dispute as to the statutory requirements. She has not done so here.

For these reasons, the Court **GRANTS** Defendants' motion for summary judgment with respect to the sixth cause of action.

### E.  Eighth Cause of Action: Meal Break Claim

The FAC alleges that because Defendants had misclassified Plaintiff as an independent contractor rather than an employee, Plaintiff did not receive uninterrupted meal breaks that she was entitled to under § 45180 of the California Education Code. (Doc. 11 at ¶¶ 122–32.) The Court, however, agrees with Defendants' argument that Section 45180 does not provide a free-standing private cause of action, not on its own. (Doc. 134-3 at 22–24.) This is because § 45180 is merely intended to supply the definition for two particular terms—differential compensation and shift. The plain text of Section 45180 reads:

> For purposes of this article, the following definitions shall apply unless the context indicates otherwise:
>
> (a) "Differential compensation" means either a reduction in the number of hours required to be actually worked or an increase in salary.
>
> (b) "Shift" means the number of hours worked and shall include a duty-free meal period of not less than one-half hour which, in the case of a seven- or eight-hour shift, shall occur approximately at the midpoint of the shift. This subdivision shall not apply to employees working six hours or less, or assigned to a split shift.

Cal. Educ. Code § 45180. The term "this article" in the preamble refers to article 3, which address differential compensation for classified employees. Section 45180 is the first provision in article 3; Section 45181 then directs school officials to "determine the practices relating to morning and

night shift salary differentials in the private employment fields in which it must compete for employees . . . and [] consider the advisability of providing comparable salary differentials;" and Section 45182 *authorizes*, but does not require, "differential compensation to those classified employees who perform duties of a distasteful, dangerous, or unique nature." Section 45184 further states that "[n]o employee assigned to work a shift entitled to differential compensation shall be demoted in class or grade as a result of such an assignment." Cal. Educ. Code § 45184.

Thus, § 45180 is clearly intended to supply the meaning of two terms for subsequent sections addressing differential compensation rather than providing a standalone cause of action. It is certainly not intended to be an enforcement provision for *meal break* violations. As such, the Court **GRANTS** Defendants' motion for summary judgment with respect to the meal break claim under the eighth cause of action.

### F. Fifth Cause of Action: Minimum Wage

Plaintiff alleges under the fifth cause of action that she worked overtime (e.g., more than 8 hours per day) without being paid at least the state-mandated minimum wage for her work. The Court notes that Plaintiff was paid $55/hour for her work. (*See, e.g.*, Doc. 134-4 at 458.) Consequently, Plaintiff was paid above the minimum wage so long as she was paid for the hours she reported.

The Court begins by noting that Defendants have paid all amounts actually submitted through Plaintiff's timesheets and invoices. (Doc. 145-1 at 6 (undisputed material fact No. 16)), and that Plaintiff has offered no serious reason for Defendants to believe that the timesheets and invoices—taken together—are inaccurate, (*see* Doc. 156 at 35 (Plaintiff's timesheets are accurate in the sense that she worked the hours included therein, but . . . are inaccurate *in that* they do not include all of the hours . . . Plaintiff performed and *included in her invoices*." (citation omitted) (emphases added)). Furthermore, there is no shortage of cases holding that unreported time worked may not be actionable, unless Plaintiff provides a legally cognizable reason for underreporting her hours or a reason that her employer should have known that the timesheets are inaccurate. *See Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) ("[W]here an employer has no knowledge that an employee is engaging in overtime work and that

employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [29 U.S.C. § 207].”); *Newton v. City of Henderson,* 47 F.3d 746, 748–50 (5th Cir.1995) (affirming summary judgment ruling for the employer because the employee turned in timesheets which did not include the overtime hours and the employee did not demonstrate that the employer should have known that the he worked more hours than those claimed on the timesheets). However, as the Court explained above, Plaintiff has raised a triable issue as to whether she was paid at all in 2019—and it logically follows that she has also raised a triable issue as to whether she was paid a minimum wage.

As such, RCESD's motion for summary judgment with respect to the fifth cause of action is **GRANTED** except as to 2019 pay. The Court is willing to entertain a supplemental motion for summary judgment should the parties uncover concrete documentary evidence such as bank or accounting records on this issue.

**G. FCSS was not Plaintiff's Employer**

Finally, because the Court has found that parts of the first and fifth causes of action present a genuine dispute of material facts, the next question is whether the case must proceed to trial with respect to all Defendants or just Defendant RCESD. Among the various reasons presented to dismiss Defendant FCSS from the case, the Court only needs to resolve one—whether Defendant FCSS was Plaintiff's employer.

The Court agrees with FCSS that “[t]he statutory duties, responsibilities, and powers of a county superintendent of schools do not create an employment relationship with employees of school districts they oversee.” (Doc. 157 at 15.) This is because state court decisions have made it abundantly clear that the superintendent of schools is merely a fiscal watchdog, without managerial powers over specific decisions at each school district. *See Polster v. Sacramento Cnty. Off. of Educ.*, 180 Cal. App. 4th 649, 661 (Cal. Ct. App. 2009) (“All of these statutes evince a legislative intent to vest the county superintendent of schools with general oversight powers and, specifically, the authority to act as watchdog for each school district's fiscal affairs. However, a superintendent's regular duties ***do not include making managerial decisions*** on the expenditure

21

of funds. He [o]r she may intervene only where there is reason to suspect fraud, misappropriation of funds, or illegality in fiscal practices." (emphasis added)). This makes sense, for legislatively mandated financial oversight should not turn a glorified auditor (*i.e.*, the superintendent) into the employer of all district employees. (*See* Doc. 157 at 15.) As such, the Court rejects Plaintiff's argument that FCSS exercised substantial control over Plaintiff's pay solely because of FCSS' power to "refus[e] to pay Plaintiff for work . . . through FCSS' normal fiscal oversight and pay procedures." (Doc. 155 at 41.) Relatedly, the Court rejects Plaintiff's contention that other reporting and monitoring requirements make FCSS Plaintiff's employer. (*Id*.) Moreover, Plaintiff's extensive discussion of Section 42127.6 merely described ministerial, advisory powers: FCSS is required to review a school district's financial conditions, "conduct study," direct RCESD to submit "financial projections," and provide review and recommendations. (Doc. 155 at 37.)

The Court also agrees with FCSS's objection to Mr. Jones' declaration on the ground that substantial portions of it are "based upon his own legal opinions, including his opinions that Defendants owed a duty to Plaintiff, misclassified Plaintiff, or were Plaintiffs joint employers, and are improper legal conclusions." (Doc. 157-2 at 2 (cleaned up).) As a general rule, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.2004) (internal citations and quotation marks omitted). In one case, the Ninth Circuit upheld the district court's order to "exclude[] the following legal explanations and conclusions" from an expert's report:

> (1) sections that discuss the UCC and/or apply the UCC to the facts of this case; (2) sections that discuss non-UCC law and/or ***apply non-UCC law to the facts*** of this case; (3) sections that discuss agency law and/or apply agency law to the facts of this case; (4) sections that *discuss the parties' legal rights, duties, and obligations under the law*; (5) sections that *label the parties' actions as 'wrongful' or 'intentional' under the law*; and (6) sections that discuss the

22

appropriate formula to calculate damages under the law.

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058–59 (9th Cir. 2008) (emphases added).

Likewise, Mr. Jones' expert report states in a conclusory manner that there "appears to be an abundance of indisputable facts in this case that show FCSS's exercise of both direct and indirect control over Plaintiffs wages, hours, and working conditions, [which are] sufficient to establish that FCSS was Plaintiffs joint employer with RCESD." (Doc. 142 at 10; *id*. at 32 (similar); *see also id*. at 24 ("Defendants Raisin City Elementary School District and Fresno County Superintendent of Schools were at all times relevant to Plaintiff's post-retirement performance of services, joint employers of Plaintiff.").) But "'unsupported [expert] affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment.'" *Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217, 219–20 (5th Cir. 2015) (quoting *Orthopedic & Sports Injury Clinic v. Wang Lab., Inc.*, 922 F.2d 220, 224–25 (5th Cir. 1991)). Mr. Jones' subjective conclusory opinions regarding "direct and indirect control"—unsupported by factual citations—are insufficient to create a *genuine* dispute of fact to survive summary judgment. *See Moore v. Robinson Oil Corp.*, 588 F. App'x 528, 530 (9th Cir. 2014) ("Moreover, the expert's conclusory testimony, without further explanation, is insufficient to meet Moore's burden of production to establish that the portable restroom was readily achievable." (citing *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012))); *Luke v. Fam. Care & Urgent Med. Clinics*, 246 F. App'x 421, 424 (9th Cir. 2007) ("An expert opinion that is merely a conclusory statement without adequate supporting facts is insufficient to defeat a summary judgment motion." (citation omitted)).

Ultimately, the Court agrees with Defendant FCSS' observation that "Plaintiff's argument is nothing more than a reiteration of its novel proposition that FCSS is an automatic employer of everyone employed by the school districts in its jurisdiction because of its statutory oversight obligations." (Doc. 157 at 17.) Plaintiff has not advanced a clear and non-conclusory argument as to how FCSS is directly managing her workload. Accordingly, FCSS' motion for summary judgment is **GRANTED** with respect to the first and fifth causes of action and is **DENIED AS**

**MOOT** with respect to all other causes of action.

**CONCLUSION**

Based upon the foregoing, the Court **ORDERS**:

(1)  Defendant RCESD' Motion for Summary Judgment (Doc. 134) is **GRANTED IN PART** with respect to the second, third, fourth, sixth, seventh and eighth causes of action.

(2) Defendant RCESD' Motion for Summary Judgment (Doc. 134) is **GRANTED IN PART** with respect to the first and fifth causes of action except as to 2019 pay.

(3) Defendant FCSS' Motion for Summary Judgment (Doc. 133) is **GRANTED IN PART** with respect to the first and fifth causes of action.

(4) Defendant FCSS' Motion for Summary Judgment (Doc. 133) is **DENIED AS MOOT** with respect to the second, third, fourth, sixth, seventh and eighth causes of action.

IT IS SO ORDERED.

Dated:   **June 12, 2026**

_____
UNITED STATES DISTRICT JUDGE